Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO.: 5:17-CV-173-JMH


LARRY G. PHILPOT              )   DEPOSITION TAKEN ON
                             )   BEHALF OF PLAINTIFF
                             )       BY:  NOTICE
           PLAINTIFF          )
                             )
                             )
VS.                          )
                             )
                             )
L.M. COMMUNICATIONS II OF    )
SOUTH CAROLINA, INC.         )
                             )   WITNESS:
                             )
           DEFENDANT          )   LYNN MARTIN


              * * * * * * * *


        The deposition of LYNN MARTIN was taken

before Lindsay Holbrock, Court Reporter and Notary

Public in and for the State of Kentucky at Large, at

the offices of Hon. William W. Allen located at 201

West Short Street, Lexington, Kentucky, on February 9,

2018, commencing at the approximate hour of 10:00 a.m.

Said deposition was taken pursuant to Notice,

heretofore filed, to be read and used on behalf of the

Plaintiff in the above-captioned action and all other

purposes as permitted by the Federal Rules of Civil

Procedure.

EXHIBIT

3

```
 1    APPEARANCES:

 2
              Hon. Stacy A. Cole
 3            GRAYDON, HEAD & RITCHEY
              2400 Chamber Center Drive, Suite 300
 4            Fort Mitchell, Kentucky 41017

 5            COUNSEL FOR THE PLAINTIFF,
              LARRY G. PHILPOT
 6

 7
              Hon. William W. Allen
 8            GESS MATTINGLY & ATCHISON

 9            201 West Short Street

10            Lexington, Kentucky 40507

11

12            COUNSEL FOR THE DEFENDANT,

13            L.M. COMMUNICATIONS II OF

14            SOUTH CAROLINA, INC.

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                                    PAGE
    WITNESS: LYNN MARTIN

3


4
    DIRECT EXAMINATION
5          By Ms. Cole   ....................   4-161

6   REPORTER'S CERTIFICATE ..................... 162-163

7          * * * *              * * * *

8
                  E X H I B I T   I N D E X
9

10  EXHIBIT NO.     DESCRIPTION   PAGE

11  (Plaintiff's:)

12  Exhibit 1    Notice of Deposition              10

13  Exhibit 2    E-mail Exchange                   49

14  Exhibit 3    Website screen shot photograph of 73
                 Willie Nelson
15
    Exhibit 4    Defendant's Discovery Responses   83
16
    Exhibit 5    Settlement Communication          100
17
    Exhibit 6    Letter from Mr. Stevens to Mr.    101
18               Philpot

19  Exhibit 7    First Amended Answer and          129
                 Counterclaim
20
    Exhibit 8    Wikipedia Printout                132
21
    Exhibit 9    Wikipedia Printout                140
22
    Exhibit 10   Answers and Objections to         152
23               Interrogatories

24  Exhibit 11   Screen Shot of Website            156

25  Exhibit 12   Screen Shot of Facebook Posting   158

1          The witness, LYNN MARTIN, after first being

2    duly sworn, was examined and testified as follows:

3                    DIRECT EXAMINATION

4    By Ms. Cole:

5    Q      Good morning, Mr. Martin.  My name is Stacy

6           Cole.  Can you, please, just state your full

7           name for the record?

8    A      Sure.  Lynn Mace Martin.

9    Q      How do you spell the middle name?

10   A      M-A-C-E.

11   Q      Have you had your deposition taken before?

12   A      I've had a deposition before, not in this

13          case.

14   Q      No, but generally, speaking?

15   A      Yeah, I've had  - I've been in a deposition

16          before, yes.

17   MS. COLE:                 I just want to go over a couple of

18                             ground rules with you so we're on

19                             the same page.

20   WITNESS:          Okay.

21   MS. COLE:                 The court reporter cannot take down

22                             nonverbal responses or when we talk

23                             at the same time.  Please wait for

24                             me to finish my question and

25                             verbalize your answers; do you

Page 20

```
 1              and try and get it back on the air.  And then

 2              some time went by, and then this other

 3              distressed opportunity which became COO was

 4              available.  So I was looking to try to

 5              acquire something else in the market, and

 6              there it was.  So I took a shot at that.

 7    Q         Great.  So how many stations in your various

 8              entities do you own today?

 9    A         Can I stop one second?  I'm sorry.

10    MS. COLE:                    Yes.

11              (OFF THE RECORD)

12    A         Can you tell me the question again?

13    Q         Yes.  In your various L.M. Communications'

14              corporate entities, how many stations do you

15              own today?

16    A         Without writing them all down, I'm  - pretty

17              much it's going to be something in the

18              neighborhood of 12 stations, 12, 13.

19    Q         Maybe a dozen or  -

20    A         Yeah.

21    Q         -- right around there?

22    A         Yeah.

23    Q         And are they all radio stations?

24    A         Yes.

25    Q         Have you ventured into the TV broadcasting
```

Page 21

```
 1              market?
 2    A         I did; I did.
 3    Q         And how many TV stations do you own and have?
 4    A         Currently, well, I don't own it now.  I had
 5              one television station that I owned.
 6    Q         And when was that?
 7    A         I bought it in 2012.  And then I, in effect,
 8              went off the air and sold it, so to speak, to
 9              the government in October of 2017.
10    Q         So let's talk a little bit about the
11              distinction between L.M. Communications, Inc.
12              And L.M. Communications of South Carolina,
13              II.  I'm just going to refer to that entity
14              as L.M. South Carolina, if that's okay, just
15              so that I don't have to say the whole thing.
16    A         Can you just say South Carolina II?
17    Q         That's fine.
18    A         Do that for me, okay, okay.
19    Q         That's fine, South Carolina II.
20    A         Just call it South Carolina II and I'll know
21              what you're talking about.
22    Q         And if I say L.M. Communications, I'm
23              generally referring to the  -
24    A         Referring to South Carolina II, okay.
25    Q         So  - well, let's talk about L.M.
```

Page 36

1        Carolina II?

2  A     We have a website.

3  Q     And what kinds of content do you have on the
4        website?

5  A     Basically, you know, we have a community page
6        where, basically, we  - I think it's
7        community and events.  So our process down
8        there is to try to tell the public what's
9        going on in the area, in Charleston.  And so
10       we do, and so, you know, basically, it's to
11       look and see what is coming to town; what's
12       already in town; you know, is there a
13       spaghetti supper at the Catholic Church.  All
14       of these things go on to the community page
15       type thing.

16 Q     Can people post on your community page, or
17       does all of the posting there have to happen
18       from a South Carolina II employee?

19 A     No, I think it has to happen from a South
20       Carolina II person.

21 Q     Is there any portion of the South Carolina II
22       website that allows for the general public to
23       make public postings on the site?

24 A     I don't know that answer.

25 Q     Do you have  - does the station 105.5 have a

1          presence through I Heart Radio?

2   A      It does not.

3   Q      So if I wanted to listen to 105.5 online, I

4          can't pull up I Heart Radio and tune into

5          that station?

6   A      You cannot.

7   Q      Is it  - is this content of the station

8          online and available to listen to on the

9          Internet anywhere?

10  A      It is.

11  Q      And where is that?

12  A      We have an app.

13  Q      And what's the app?

14  A      Off the top of my head, Bridge 105.5.  You

15         have to go in the app  - there's a way to do

16         it.  You go to the website, actually, and

17         there's a place to click it, and you can

18         download it.  And then it  - you can get it

19         that way.

20  Q      Did L.M. II  - I'm sorry.

21  A      It didn't have it at that time, by the way.

22  Q      Okay.  You have that now but not in 2014?

23  A      Right.

24  Q      Did you have in 2014 any ability on your

25         website or otherwise through an app for a

Page 38

```
 1              listener to listen to the broadcast online?

 2    A         In 2014, I don't recall whether we did for

 3              sure or not.  But I know that it's a constant

 4              issue that we're trying to figure out how to

 5              do, to be honest with you.  It's something

 6              relatively new for us.

 7    Q         And is it  - does it change the dynamics of

 8              broadcast ad sales when you have a presence

 9              online, or is it the same process for sales?

10    A         We don't sell ads online.  You know, we're

11              selling over-the-air radio, but then we are

12              attempting to be able to have it played

13              online so it runs.  But there's no secondary

14              process to it.

15    Q         But there's no increase in price for

16              broadcast ads because it's also available

17              online, or is there?

18    A         No, there's not.

19    Q         Who's the operator of the app that you

20              currently have where people can listen to the

21              broadcast?

22    A         You mean, who do we get it from?

23    Q         Who did you use to create it, or is it

24              through  -

25    A         It's a company called Secure Net.
```

Page 39

```
 1    Q        So it is not part of sort of a network.  It

 2             is your own app?

 3    A        Yes.

 4    Q        On your website, L.M. Communications

 5             Broadcast Media Group website, I'll represent

 6             that it says L.M. Communications is a

 7             multi-media company, specializing in

 8             on-demand entertainment.  What is on-demand

 9             entertainment mean?

10    A        Radio.

11    Q        And you don't currently have any television

12             platforms under any of your ownership or any

13             of your entities, correct?

14    A        I don't.

15    Q        And is 105.5 in Monks Corner, South Carolina?

16    A        Well, that's a technical term of what's

17             called the city of license.  So at one time

18             when I purchased the station, it was licensed

19             in Monks Corner - if you remember, I

20             mentioned at 105.3.

21    MS. COLE:                  Uh-huh (AFFIRMATIVE).

22    A        So in order to try to cover the Charleston

23             market better, we were able to change the

24             city of license to Kiawah Island.  So

25             technically, it's actually licensed to Kiawah
```

1           Island.

2    Q      Part of your Counterclaim also states that

3           L.M.C. operates websites and listener

4           engagement portals to enhance the experience

5           of its listeners.  What are listener

6           engagement portals?

7    A      That, basically, means, you know, the app.

8    Q      Does the app include a log of music recently

9           played?

10   A      No.

11   Q      Does the website or any portion of the

12          website include a feature describing what is

13          currently playing on the radio station or

14          provide a log of music recently played?

15   A      I know that you can listen on the website

16          because we stream.  And it will come up and

17          say who's playing at the time.  I don't

18          believe that it keeps or shows a log that you

19          can go back and go, what got played when;

20          who; and all that type of stuff.

21   Q      When it shows, now playing, is there an image

22          associated that you can see on the website

23          of, say, the album cover?

24   A      Sometimes there is; sometimes there isn't.

25   Q      So for the songs where there is an image

Page 44

```
 1    Q        As a gesture of goodwill associated with

 2             buying the ad?

 3    A        Yeah.  I mean, you can't buy the streaming

 4             ads separately from the radio, and the radio

 5             pricing has nothing -- is not based on how

 6             many theoretical people are listening online.

 7             It's just the value -- the value proposition

 8             hasn't happened yet.  Maybe down the road it

 9             may change.  But for us and in our

10             competitive area there, it's not a factor.

11    Q        Is the website an important driver of

12             potential listeners to the broadcast station?

13    A        It's really -- no.  It's really more service

14             that, you know, I feel that since the

15             Internet is out there, we need to have some

16             presence on it.  So you know, basically,

17             we're, you know, we're hoping that people

18             want to go there and check things out, but

19             it's not something that really is driving any

20             revenue for us because of it.  Again, it's

21             more like the Joneses, if they're doing it,

22             we need to do it.  A big company -- you

23             mentioned I Heart; if they're doing it, we

24             need to try to do it.  But we're just not in

25             the same league with them.
```

Page 48

```
 1    A       Well, that would be Paul Smith would probably

 2            know what we're doing down there.

 3    Q       Does South Carolina II or any -- let me start

 4            there, does South Carolina II have any

 5            policies in place governing posts to the

 6            website or social media?

 7    A       Well, there's an overall policy that I have

 8            in how we operate the stations, and that is

 9            that, you know, we want to operate the

10            stations in the right way.  We want to make

11            sure that, to the best of our ability, and

12            that we're doing things that  - the way we're

13            supposed to do them.  So from that

14            standpoint, there is, you know, that's kind

15            of how I always have viewed this.

16    Q       Is there a written policy in place?

17    A       There is now.

18    Q       And when was that implemented?

19    A       In  - well, I sent a letter out after this

20            particular occasion occurred and reiterated

21            the fact that we have had a policy; we've

22            always had a policy.  But I felt the need to

23            put it into a more stringent written policy

24            to make sure that our people understood that

25            if you're going to use something that
```

| | | |
|---|---|---|
| 1 | | basically, you know, you've got to make sure |
| 2 | | that you're attributing whatever it is that |
| 3 | | you're using to the right folks. |
| 4 | Q | I'm going to hand you what we are marking as |
| 5 | | Exhibit 2.  You should  - I have only one |
| 6 | | other copy, so I'll keep it if that's okay. |
| 7 | | I'm good; I just don't have one for you. |
| 8 | MR. ALLEN: | Well, I brought one, just in case. |
| 9 | MS. COLE: | Thank you. |
| 10 | Q | Mr. Martin, are you familiar with the |
| 11 | | document that I just handed you; we've marked |
| 12 | | as Exhibit 2? |
| 13 | A | Yes, I wrote it. |
| 14 | | (REPORTER MARKS A COPY OF E-MAIL EXCHANGE AS |
| 15 | | EXHIBIT 2 FOR THE PURPOSE OF IDENTIFICATION, |
| 16 | | AND THE SAME IS ATTACHED HERETO AND FILED |
| 17 | | HEREWITH.) |
| 18 | Q | So is that your -- if you look at the top, |
| 19 | | the from line, is that your corporate email |
| 20 | | address, Lmartin@LMCom.com? |
| 21 | A | Yes. |
| 22 | Q | Who's Lee Reynolds? |
| 23 | A | Lee Reynolds is the same as Scooter.  In |
| 24 | | broadcasting, sometimes you have people that |
| 25 | | have a different name that's an on-air name. |

Page 50

```
 1              So when I -- I still sign paychecks.  So

 2              sometimes I have a person, I go, who is that

 3              because I know them as -- his name was

 4              Scooter, but it's Lee Reynolds, and so, yes,

 5              that's who that is.

 6    Q         Of the other people that we discussed today,

 7              do they have -- and do any of them other than

 8              Scooter Stevens have, you know, an alias, or

 9              was I referring to an alias?

10    A         I'm not sure who -- you have to give me

11              specific names, but I --

12    Q         Let's see, we went back through Charlie Cohn.

13    A         Charlie Cohn was Charlie Cohn.

14    Q         Jessica Turner?

15    A         Is Jessica Turner, but she could be somebody

16              different on air.  I don't remember, but she

17              does a dual scenario, but I can't remember if

18              she's Jess or Jessica or something else on

19              air, because I -- you have to realize I don't

20              live in Charleston.

21  MS. COLE:                     Of course.

22    A         You know, I visit there and oversee, but I'm

23              just not day to day there.  I don't know.

24    Q         Matt Potter?

25    A         I think he's Matthew Potter, maybe, on the
```

Page 51

```
 1              air or -- but that's close.

 2    Q         As far as you know, that's his name?

 3    A         Yeah, he doesn't have another name, yeah.

 4    Q         Kelly Bazzle?

 5    A         I don't know.  I think Kelly Bazzle was Kelly

 6              Bazzle.

 7    Q         Bethany Harpster?

 8    A         That I can confirm.

 9    Q         And Katy Redfern?

10    A         That's Katy, as Katy Redfern.

11    Q         Let me see, who's Craig Olive?

12    A         Craig Olive is the general manager in

13              Lexington.

14    Q         Dotsie is it Klei?

15    A         It is, Dotsie Klei, happens to be from

16              Cincinnati, as a matter of fact.

17    Q         And who is she?

18    A         She's the general manager in West Virginia.

19    Q         Who's Chilli at WKLC.Com?

20    A         Chilli is the program director in West

21              Virginia for WKLC.

22    Q         And we've talked about the others.  Who's

23              Carrie Stein?

24    A         Carrie Stein is a person here in Lexington,

25              and she is a promotions person and somebody
```

Page 52

```
 1              that  - she sells.  She's a senior seller for

 2              us.  So sometimes I include her, depending on

 3              what I'm thinking about when I send something

 4              out.

 5    Q         As far as this particular document goes, you

 6              had previously referenced that you now have a

 7              written policy.  Is this the document you're

 8              referring to as being that written policy

 9              that's in place now?

10    A         You know, I think we may have had or have a

11              written policy somewhere.  I mean, this

12              company has been around for a while.  And you

13              know, we've moved locations from one place to

14              another over -- sometime over the last 15

15              years, we've moved.  So what I was really

16              saying here is we've always had a policy, and

17              I want to reiterate that this policy is there

18              and to take it very, very seriously that this

19              cannot happen.  And I just wanted to make

20              sure our people got the message again.  So

21              that's why I wrote this.

22    Q         So prior to sending this email, were you

23              aware of definitely having a policy on

24              infringement in writing prior to this?

25    A         Yeah, I think so.  I mean, basically what I
```

1           recall about this is that when, you know,

2           when this all happened originally, which was,

3           what,  14, 2014?

4   MS.  COLE:                    Yes.

5   A       And we got a letter from Mr. Philpot, you

6           know, basically, you know, when that

7           happened, and it, you know, we said, hey,

8           we're not sure if what we're being told is

9           right or wrong from his point of view.  We,

10          basically, said, hey, you know, we have a

11          policy that this doesn't happen.  It can

12          happen, and I don't want it to happen again.

13          And then when we had another occasion which

14          was this other thing  -

15  Q       You're referring to the Santana photo?

16  A       Yeah, yeah.  Our guy wished them happy

17          birthday or something and, you know, puts a

18          picture up on his own site, as well as his, I

19          think, whichever way that went.  You know,

20          then I went bad crazy and wrote this,

21          basically, what happened.

22  Q       So is it  - I don't know that I'm clear.  Are

23          you saying that you had a written policy in

24          place prior to sending this email?

25  A       I can tell you I've always had a policy that

Page 54

```
 1              we operate in the right way, and I  -
 2    Q         Was it in writing?
 3    A         And I can't tell you right now that I have a
 4              written policy or had one at that time.  I
 5              don't recall.
 6    Q         Can you search or do the investigation into
 7              whether there was a written policy in place
 8              in 2014?
 9    A         I can try; I'll do my best.
10    Q         Okay.  So if you would take a look at this
11              email, please, and look at the first
12              paragraph.  It says, Staff, as you know, I
13              have spoken to all of you numerous times
14              about using photographs and posting pictures
15              and things on the Internet and social media
16              on company sites, as well as your own sites
17              and what the proper procedure should be after
18              an innocent incident occurred in South
19              Carolina.  Did I read that correctly?
20    A         Uh-huh (AFFIRMATIVE).
21    Q         You say here that you discussed what the
22              proper procedure should be.  What are you
23              referring to there?
24    A         Well, in this particular area, what I'm
25              saying is that it's been alleged that a
```

```
 1   MR. ALLEN:          Well, and I think the question
 2                       would have been identify all people
 3                       that were either employed by or
 4                       working as an intern in L.M. II at
 5                       that particular time.  That would
 6                       give you all the possible names,
 7                       but no one has asked that question.
 8                       And I don't know that Mr. Martin is
 9                       prepared to answer it now here, but
10                       that's something that could have
11                       been asked.
12   MR. COLE:                   I think that we're --
13   MR. ALLEN:          But it has not been.
14   Q      It was referenced that there is an intern who
15          may have done the post.  Are we referring to
16          generally that there was one of multiple
17          interns who might have done the post, or that
18          there was one intern in particular who may
19          have been the one who did the post?
20   A      I don't know the answer to that.
21   Q      How many interns were there in 2014 at  -
22   A      I don't have the answer to that; I don't
23          know.
24   Q      Has anybody asked the question internally or
25          done the investigation to find out who the
```

Page 62

1          name of all the possible people who did the

2          post could have been?

3     A    Again, I don't know that answer.  I'd like to

4          tell you.  Listen, I wanted to know who it

5          was, but we weren't able to find out who it

6          was.  And there's no secrecy about not

7          wanting to find out or know who that person

8          was.  But when the information has come back,

9          when Charlie ran the investigation, and

10         again, you know, this wasn't something we

11         took very lightly.  We tried to say, who did

12         this?  When was it done?  How did it get

13         done?  And what came back was the answer I've

14         given you.  I don't know that answer, and we

15         don't know specifically who absolutely did

16         that.  We don't know.

17    Q    Were there interns in the period -- at South

18         Carolina II in the period from February to

19         May of 2014?

20    A    There may have been; I don't know.

21    Q    So when the answer that has been provided to

22         discovery responses is that it may have been

23         an intern, that's - is that referring to a

24         particular intern or just generally that it's

25         sort of speculation that it might have been

Page 63

```
 1              an intern; it might have been this; it might

 2              have been that?

 3   A          I think your last answer is probably the

 4              right answer.  I don't know that, but I just

 5              don't  - I can't give you an answer I don't

 6              know.  I'd be happy to give you the answer; I

 7              don't know what it is.

 8   Q          What was not  -

 9   A          I can't tell you who did it.

10   Q          The reason I'm sort of pressing this is not,

11              again, to get you to change your answer as to

12              you know who did it.  My question was, it was

13              not clear to me whether there was a specific

14              intern in mind as this, you know, possible

15              person or whether that was just a general

16              reference to a possible scenario.  That's

17              what I'm trying to ascertain.

18   A          I can't give you more than I'm giving you

19              because I don't know the answer.

20   Q          Is that something that if you were to inquire

21              of Paul Smith in terms of determining who the

22              interns were at the time in question here,

23              say, February to May of 2014, the names of

24              all employees  - I'm sorry, of all interns

25              from that period could be determined; do  -
```

```
 1    A        I don't know.  Paul was the sales manager

 2             during that time frame.  So I don't know

 3             weather or not he would know that.  Again,

 4             you know, Charlie Cohn was the general

 5             manager.  He went and did this investigation

 6             and gave us the information we have, and

 7             that's the source of where we basically have

 8             this idea of what we were told.

 9    Q        So do I remember correctly that you told me

10             that Paul Smith is now general manager --

11    A        Yes.

12    Q        -- in place of Charlie Cohn?

13    A        He replaced Charlie when Charlie retired in

14             August.

15    Q        So would he have access to the HR records for

16             the time in question?

17    A        I don't know that answer.  He might.

18    Q        Who would have access to HR records from that

19    time in question for South Carolina II?

20    A        It would be probably Bethany.

21    Q        Bethany Harpster; is that --

22    A        Uh-huh (AFFIRMATIVE).  She would be the more

23             likely person.  Again, you have to

24             understand, I'm not down there day to day,

25             and I oversee this whole thing, but you know,
```

Page 65

```
 1              she would be one possible person who might be

 2              able to tell us that answer.

 3    Q         Did anybody do an investigation into the HR

 4              records to see who the interns were at that

 5              time?

 6    A         I don't know; I don't know that.  We don't  -

 7              our interns are not paid interns.  I don't

 8              know whether they'd be on the HR records.

 9    Q         So you could potentially have interns at

10              South Carolina II who  - where there's no

11              record of them or their  - that they spent

12              time there or worked?

13    A         Personally, I just don't know the answer to

14              that.  I don't know whether, you know, I

15              would hope that we had some record of

16              somebody that's doing something at the

17              station.  But I just don't know that answer,

18              myself.

19    Q         Are there any policies and procedures,

20              written policies and procedures, in place

21              that governs responsibilities of interns,

22              what they can and cannot do on behalf of the

23              station?  Is there any written policy like

24              that in place?

25    A         I don't know.
```

Page 66

```
 1   Q        You're not aware of any as you sit here right

 2            now?

 3   A        I didn't say that.  I said I don't know.

 4            There could be; there could not be.  I'd have

 5            to check; I don't know.

 6   Q        But sitting here right now, you cannot say, I

 7            know that there is a policy in place; is that

 8            right?

 9   A        I can sit here and tell you that I don't know

10            whether there is or there isn't a written

11            policy about interns.  There may be but I

12            don't know today.

13   Q        Is there, you know, an understanding or some

14            sort of orally communicated policy about what

15            interns can and cannot do that would have

16            been in place in 2014?

17   A        Absolutely.  I mean, when an intern would

18            come to the station, they are told -- you

19            know, they're there to learn what happens at

20            a radio station.  So they're exposed to

21            different things that are done.  And if

22            somebody is going to be asked to help with

23            certain tasks, they are told that, hey, do

24            this; do this; do this.  And we do whatever

25            this, this, and this is in the right way.
```

Page 67

```
 1              They would be expected to do it in the right

 2              way.  And that's what, I think, is, you know,

 3              what happened here is that we have somebody

 4              who -  and again, I don't know whether it's

 5              an intern or whether it was an employee.  We

 6              don't know who ended up being the person who

 7              did this.

 8    Q         Would there have been one person or multiple

 9              people in charge of any interns at the time

10              in question?  Again, I'm just going to define

11              as a February through May of 2014?

12    A         Okay.  I don't know that answer.

13    Q         Is it typically practiced that you would have

14              one person assigned to make sure all the

15              interns either knew what they were doing or

16              where to go or who to go for what?

17    A         Yeah.  I know it's  - I'm really sorry; I'd

18              like to tell you an answer that you're

19              looking for.  I don't get directly involved

20              in the  - in what interns do in the intern

21              program itself and how it works, how long

22              they're there, any of that type of stuff.

23    Q         So you don't know who would be specifically

24              tasked with oversight of an intern in South

25              Carolina II?
```

```
 1    A        I don't.

 2    Q        Have you ever asked the question to see who

 3             would have been managing any interns at that

 4             time?

 5    A        Well, I did after this.

 6    Q        So who was responsible for interns at South

 7             Carolina II in that period that we've been

 8             discussing?

 9    A        I don't know.  I said I looked into it after

10             this, meaning after this has all occurred,

11             I've asked my manager to be involved about

12             what happens here.

13    Q        And what manager?

14    A        Paul Smith, going forward when he became the

15             general manager.

16    Q        But prior to that, you don't know who would

17             have been responsible for any interns at --

18    A        I don't know.

19    Q        -- South Carolina II at that time?

20    A        I don't know specifically.  I mean, Charlie

21             Cohn was the general manager.  My best guess

22             would be Charlie Cohn would have been

23             involved in how many interns we would have,

24             when they would come, and what areas they'd

25             be working in, and that type of thing.
```

Page 69

1    Q      Did you ever ask him the question of who was

2           in charge of any interns at that time?

3    A      No.  The questions I asked were in the

4           context of, can you tell me how this happened

5           and who did it and why it happened?  That's

6           what I asked him.  And what he came back with

7           is what we basically, or I think, tried to

8           tell you is that, you know, I don't

9           specifically.  They can't come up with one

10          individual who says, hey, I was doing it that

11          day; I did that.  Whether it was right or

12          wrong, I did it.  I mean, the point is if we

13          had that person, we would tell you Joe Blow

14          did it or Betty Smith did it, or whatever.

15          It's not trying to hide who did it.  We just

16          don't know who did it.

17   Q      I'm just trying to not beat a dead horse and

18          repeat myself here.  Is it possible, based on

19          the practices of South Carolina II at the

20          time in question that interns would have had

21          the ability to do what they want on behalf of

22          South Carolina II?

23   A      Anything is possible.  You know, I doubt it,

24          you know.  I think that, you know, again,

25          somebody is working on a community page and

Page 70

1        looking at what's going on there and had this

2        list of things that were put together that

3        either they put together or somebody else put

4        together.  But again, that's kind of how it

5        works.  And you know, they went out and saw,

6        hey, Willie Nelson is coming to town and put

7        it on the list of things that are coming to

8        town.  And saw a picture on a free media

9        site, and the picture doesn't have anything

10        underneath it that says who did it or

11        whatever, and they thought it was okay to do

12        it, and they posted it.  It wasn't done on

13        purpose.

14   Q    Well, you don't know that it wasn't done on

15        purpose because you don't know who did the

16        post, right?

17   A    When I say on purpose, is it wasn't done to

18        try to take something from somebody; in this

19        case, Mr. Philpot.

20   Q    But you don't actually know that that's true

21        because you don't know who posted it?

22   A    No, I don't know who posted it.

23   Q    Do South Carolina II employees get any

24        training regarding the Digital Millennium

25        Copyright Act from South Carolina II?

Page 71

```
 1   A      You know, they're told overall that the
 2          policy of the company is to do the right
 3          thing in whatever area that we're dealing
 4          with.  That's what we're told.  Since this
 5          happened, this email that I wrote is a
 6          reiteration of what our policy was, is, and
 7          will be in terms of what our folks are
 8          supposed to do down there.
 9   Q      But there's no specific education as to what
10          the Digital Millennium Copyright Act is or
11          how to follow it or what might be considered
12          a breach of it; is that right, you don't
13          offer any specific training as to those
14          things to your employees?
15   A      I don't know that for a fact.  I don't think
16          so.
17   Q      So let's turn back to Exhibit 2, if you don't
18          mind.  If you look down at 1, 2, 3, 4, the
19          fifth paragraph there that says, we are never
20          to use any photographs without gaining proper
21          permission -
22   MR. ALLEN:         I'm sorry, are you on the email or
23                      are you on this thing?  I
24                      apologize.
25   MS. COLE:                 I'm sorry, Exhibit 2.
```

Page 95

```
 1   A        I'm speculating that he did.

 2   Q        You're not aware of any specific discussion

 3            that occurred; is that right?

 4   A        No.

 5   Q        Has South Carolina II made any kind of

 6            indemnification demand on Intertech for this

 7            dispute?

 8   A        No.

 9   Q        How did South Carolina II come to obtain the

10            Willie Nelson photo that was shown in Exhibit

11            3 for purposes of that post?

12   A        Are you talking about the one that's at issue

13            that --

14   MS. COLE:                    Yes.

15   A        -- Mr. Philpot -- that --

16   MS. COLE:                    Yes.

17   A        -- you're here asking us about?

18   MS. COLE:                    Of course, yes.

19   A        Okay.  My understanding is that, you know, an

20            intern or employee, of which we don't know

21            who it was, was working on the page of the

22            event page of what was happening there, and

23            put up something in regard to, hey, these

24            guys are coming to town on whatever day it

25            was, and they put a picture up there.  That's
```

```
 1                how I understand it happened.

 2    Q          But is it a fair statement to say that that's

 3                kind of a best guess because nobody really

 4                knows who posted it?  Is that a fair

 5                statement?

 6    A          Yes.

 7    Q          So I know that in some of these documents

 8                there was reference to the photo being the

 9                same photo that is on a Wikipedia page.  Is

10                there any certainty that the photo actually

11                came from the Wikipedia page?

12    A          Well, from what I was told, what I've been

13                told through this whole process of trying to

14                investigate where it came from, that's our

15                best guess.  That's what we think.  That's

16                what I was told it -- that's where it came

17                from.

18    Q          And again, sorry, who told you that?

19    A          Well, I mean, between Charlie Cohn and this

20                investigation, that's what has come up that

21                that's everybody's best guess is where that

22                picture came from.

23    Q          But nobody knows that with certainty; is that

24                right?

25    A          I can't tell you that they do.
```

```
 1   Q      Did South Carolina II ask permission to use

 2          the photo that was in the Exhibit 3, in the

 3          posted issue?

 4   A      You know, wherever they -- where they got it,

 5          I think they used it, and they posted what

 6          they saw.

 7   Q      So, again, did anybody at South Carolina II

 8          ask permission to use that photo prior to

 9          posting it?

10   A      I don't know that.

11   Q      What steps were taken prior to posting it to

12          determine ownership of that image?

13   A      My understanding is they went on that

14          Wikipedia site which was a free site and saw

15          a picture.  And they reproduced what they

16          saw.  There was nothing that said that it was

17          attributed to anybody.  And they thought

18          since they were up on that free site, that

19          they had -- that that was affirmation that it

20          was in the public domain; I suppose that's

21          the way to say that.  And they utilized it.

22   Q      But you don't actually know that that's what

23          happened; is that right?

24   A      That's my best understanding of what

25          happened, but I can't --
```

Page 98

1    Q        Understanding from --

2    A        From the report that -- the overall

3             background report that Charlie and his people

4             did to try to ascertain what happened.

5    Q        But again, you don't know that that is what

6             happened; is that right?

7    A        I don't -- I can't tell you I know 100

8             percent, no.

9    Q        Did LM -- I'm sorry, did South Carolina II

10            attribute the photo anywhere on its website

11            or the post to Larry Philpot?

12   A        I don't know that for sure.  I can ask -- I

13            can do the same supposition.

14   Q        Well, if you take a look at the pages in

15            Exhibit 3, is there anything in there that

16            would indicate that there's attribution given

17            to Mr. Philpot?

18   A        No.  As I said earlier, you know, I believe

19            that our people thought that this was a

20            picture that could be used.  You know, as I

21            understood, this was a picture of Willie

22            Nelson at a charity event, and they thought

23            that there wasn't an issue there; there

24            wasn't anything underneath the photo at the

25            time.  In other words, they didn't -- they

Page 99

THIS CONFIDENTIAL PAGE HAS BEEN FILED
UNDER SEAL

1

2

3

4    Q

5

6

7    A

8

9    Q

10

11   A

12   Q

13

14   A

15   Q

16

17

18

19   A

20   MS. COLE

21   Q

22

23

24

25

Page 109

```
 1   Q        Did the station, South Carolina II, receive

 2            any revenue from the event itself?

 3   A        We sold some radio advertising to the

 4            promoter.

 5   Q        If you wouldn't mind to turn back, please, to

 6            Exhibit 4.  This is the big one.

 7   A        This thing here?

 8   MS. COLE:                     Yes.

 9   A        Okay.

10   Q        And if you would turn, please, to LMLP 1.

11            That's it.

12   A        Okay.

13   Q        Have you ever seen this document before?

14   A        I saw it when all this after the fact

15            happened, and so on and so forth, and we were

16            putting stuff together.

17   Q        Got it.  Who's AEG?

18   A        AEG, I believe is the actual promoting

19            company of the event.  That's who we would

20            have interfaced with to sell the ads for the

21            concert.  So they would be called the

22            promoter, I would say, is the right term.

23   Q        Can you describe for the record, what is this

24            document?

25   A        What this is, is basically an insertion order
```

Page 117

1        THIS CONFIDENTIAL PAGE HAS BEEN FILED
2                        UNDER SEAL
3
4
5
6
7
8
9
10
11
12
13
14
15    Q
16
17
18
19    A
20    Q
21
22
23
24    A
25

CONFIDENTIAL



Page 118

## THIS CONFIDENTIAL PAGE HAS BEEN FILED UNDER SEAL

```
 1
 2
 3    Q
 4
 5
 6    A
 7    Q
 8    A
 9    Q
10    A
11
12
13    Q
14
15    A
16    Q
17
18    A
19
20
21
22    Q
23
24    A
25    Q
```

CONFIDENTIAL

Page 119

## THIS CONFIDENTIAL PAGE HAS BEEN FILED UNDER SEAL

1

2

3

4     A

5     Q

6

7     A

8     MS. COL

9     A

10    Q

11    A

12

13

14

15

16

17

18

19

20

21     Q

22

23

24     A

25

CONFIDENTIAL

Page 120

```
 1              or not.  Again, I'll go back to this, you

 2              know, we're not a sophisticated group or

 3              company in regard to this type of material.

 4              And so when we went back under Charlie's

 5              investigation to try to find whatever we were

 6              asked to find, we did the best we could and

 7              tried our best to find and provide what we've

 8              been asked to do.

 9     Q        So what steps then did -- you know, sitting

10              here today, what steps are you certain that

11              South Carolina II took to preserve documents?

12     A        You know, I know what I asked them to do.  I

13              asked them to go and investigate, figure out

14              what happened, provide us with what happened.

15              That's what I know.

16     Q        Anything else that you specifically know took

17              place in order to preserve documents?

18     A        No, other than as I said, I'm confident our

19              people didn't destroy documents or try to do

20              that.

21     Q        So if you were to go back --

22     A        If they were there in the first place.  My

23              point is, I don't even know.  I mean, I don't

24              know if they're there in the first place.  We

25              assume they are, based on what -- you know,
```

Page 121

```
 1              what's happened here.  I mean, assuming that

 2              everything is always up there in the

 3              Internet, never goes away.  You know, people

 4              tell you like, hey, don't -- you have to be

 5              careful with doing personal things on the

 6              Internet which that's why I don't even have a

 7              Facebook page, personally.  It's my --

 8    Q         Were there any -- do you have record

 9              retention policies in place at South Carolina

10              II, written record retention policies?

11    A         In regard to specifically, what?

12    Q         Anything.  Any records, just record retention

13              policies that would --

14    A         We keep --

15    Q         -- govern any corporate documents?

16    A         We keep records there of what we are doing in

17              our normal course of business for multi

18              years.  How many years, I don't know.

19    Q         So are you aware of a written record

20              retention policy that would govern how long

21              you keep various documents in place at South

22              Carolina II?

23    A         I'm not aware of it.

24    Q         Did anybody take at South Carolina II -- take

25              any steps to turn off any auto delete
```

Page 122

```
 1              functions?

 2    A         I don't know.

 3    Q         Have any archives, electronic archives, been

 4              searched with respect to responsive documents

 5              in this case?

 6    A         I would think they would have.  I don't know.

 7    Q         Did you direct anybody to search archives?

 8    A         I asked them to try to find the date of the

 9              material and from the time that this all took

10              place.

11    Q         What steps have been taken to collect

12              documents and emails within South Carolina II

13              that would relate to this case?

14    A         Again, you know, my manager ran the

15              investigation of trying to find this.  What

16              steps he took, I would hope, would be across

17              the board.  And I believe that he has done

18              that, and the information we have is what

19              we've given you.

20    Q         So you don't know specifically what steps may

21              or may not have been taken to preserve

22              documents?

23    A         I can't give you a 1 through 10 list, no.

24    Q         Did you talk to anybody at South Carolina II

25              about what steps they may have taken to
```

# MARTIN DEPO EXHIBIT 2

## William W. Allen

| | |
|---|---|
| **From:** | Lynn Martin <lmartin@lmcomm.com> |
| **Sent:** | Tuesday, May 16, 2017 7:32 PM |
| **To:** | Lee Reynolds |
| **Cc:** | Craig Olive; Dotsy Klei; chili@wklc.com; Paul Smith; Matthew Potter; Jessica Turner; William W. Allen; Kerri Stein |
| **Subject:** | use of photographs on internet or facebook |

Staff,

As you know I have spoken to all of you numerous times about using photographs and posting pictures and things on the internet and social media on company sites as well as any of your own sites and
What the proper procedure should be after an innocent incident occurred in South Carolina.

We had an occurrence in Charleston South Carolina where someone who works for us or an intern made a mistake and posted a picture of Willie Nelson on our web site.  Our representative thought they had permission to use such photograph because Wikemedia portrays itself to be a FREE WEB SITE.     It turns out that this is not necessarily the case and our interpretation of such has been called into question.

I believe  It was an honest mistake,  however,  I want to be crystal clear,  this kind of mistake in the future cannot be accepted nor tolerated.   This has landed our company and me in Federal Court over a copy right infringement claim.

While I believe this situation was actually part of an entrapment plan by such photographer,  we must be vigilant in how we conduct ourselves.

We are never to use any photograph's without gaining proper permission from the source to be licensed to use any such photograph for any reason and showing the proper accreditation.   Is that clear ?

No one is authorized to use any wikemedia or wikepedia or any other so called free web site for any pictures or information.  We need to go to the record labels themselves for officially authorized photo's  that they give us written permission to use.   Only if we have a written authorization to us and signed off on by the GM and PD at any of my radio stations can we then use them.

No exceptions.

If this policy is not strictly followed,  you are subject to dismissal with cause.   I want to be sure everyone understands this.

We have just  had another claim of unauthorized use of a photograph in Lexington.   This photo was supposedly taken by the same photographer I am already in court with here in Lexington.   I feel
Let down and disappointed that this has occurred.

By not policing this area with all employees and demanding they act accordingly  as I have requested on numerous occasions,   clearly everyone has not gotten the message.

I have spoken to literally everyone of you all personally  to explain that we must police ourselves in this area.   Our company has been exposed to serious and costly litigation and possible forfeitures if these allegations are proven to be true.

1



EXHIBIT
2 LH

LMLP000056

I am going to hold each department head liable for their own departments and the GM,s are to be responsible for all their staff members.   This is not to happen again.

Department heads,  I expect you to personally discuss this with everyone on your team.


Lynn

*Lynn Martin*
*President*
*LM Communications*
*Lexington, Kentucky*
*Ph: 859-233-1515*
WGKS-FM / WBVX-FM / WCDA-FM / WBTF-FM / WLXG-AM / WLXO-FM



LMLP000057

# MARTIN DEPO EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

LARRY G. PHILPOT,

     Plaintiff,

                                NO. 5:17-cv-173-JMH

V.

L.M. COMMUNICATIONS II OF
SOUTH CAROLINA, INC.,

     Defendant.

---

## ANSWERS AND OBJECTIONS TO REQUESTS FOR DOCUMENTS

---

     The following answers and objections to the Plaintiff's requests for documents are submitted on behalf of Defendant, L.M. Communications II of South Carolina, Inc. ("LMSC").

<u>Preliminary Statement</u>

     As to each paragraph below in which LMSC states that the documents described in that paragraph will be produced, LMSC will produce such documents, or copies thereof, for inspection in the offices of Gess Mattingly & Atchison, P.S.C., 201 West Short Street, Lexington, Kentucky 40507 (or at such other place as may be agreed upon by counsel for the parties) at such dates and times as counsel for the parties may agree. Upon inspection, if counsel for Plaintiff desires a copy of any of the documents inspected, LMSC will cause such copies as are ordered by Plaintiff's counsel to be made, at Plaintiff's expense, at a cost to be agreed upon by counsel.

EXHIBIT
4 LH
ALL STATE LEGAL®



**Advertising Plan**

Date Printed: 21-Feb-14
Time Printed: 2:03 PM

| | |
|---|---|
| **Event:** Alison Krauss + Union Station / Alison Krauss & Un **Group:** New York | **Show Date:** 08-May-14 |
| **Artist:** Alison Krauss & Union Station, Willie Nelson | **Venue:** Family Circle Stadium **Announce Date:** 10-Feb-14 |
| **Support:** TBD | **City:** Charleston **On-Sale Date:** 28-Feb-14 10:00 AM |
| | **# of Shows:** 1 |

### Insertion Order

| Station | Ownership | Format | Day | Time | Length | Spots | Gross | Net |
|---|---|---|---|---|---|---|---|---|
| WCOO The Bridge | Independent | AAA | Tue 25-Feb | 6a-10a | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Tue 25-Feb | 3p-7p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Wed 26-Feb | 6a-10a | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Wed 26-Feb | 10a-3p | :60 | 1 @ 20.00 | $20.00 | $17.00 |
| | | | Wed 26-Feb | 3p-7p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Thu 27-Feb | 6a-10a | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Thu 27-Feb | 10a-3p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Thu 27-Feb | 3p-7p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Fri 28-Feb | 6a-10a | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Fri 28-Feb | 10a-3p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Fri 28-Feb | 3p-7p | :60 | 2 @ 20.00 | $40.00 | $34.00 |
| | | | Fri 28-Feb | 7p-12a | :60 | 3 @ 10.00 | $30.00 | $25.50 |
| | | | | **Subtotal** | | | $450.00 | $382.50 |
| | | | | **Tax** | | | $0.00 | $0.00 |
| | | | | **Total** | | 24 | $450.00 | $382.50 |

**Instructions:**
1) YOU MUST SIGN ORDER & FAX/EMAIL BACK OR SEND CONFIRMATION UPON RECEIPT OF MEDIA BUY
2) CONTRACT/SPOT LOGS MUST BE SENT FOR ORDERS THAT HAVE NOT BEEN INVOICED
3) BEST EFFORTS MUST BE MADE TO SCHEDULE SPOTS AT 1ST OUTRO IN BREAK
4) SPOTS MAY BE CANCELLED AT ANY TIME DUE TO ARTIST MGMT DICTATIONS
5) ROS SPOTS MUST RUN IN EQUAL ROTATIONS
6) SPOTS IN SAME PROGRAMMING SHOULD NOT RUN IN SAME BREAK
7) NOT FOLLOWING CORRECT TRAFFIC INSTRUCTIONS WILL RESULT IN MAKE-GOOD
8) PLEASE REFERENCE ISCI/SHOW ID ON CONTRACT/INVOICE
9) INVOICE MUST REFLECT GROSS AND NET TOTALS
10) PLEASE HOLD ONTO ALL SPOTS UNTIL THE SHOW HAS PLAYED OFF

**\*\*PLEASE NOTE CHANGE OF BILLING ADDRESS\*\***
**AEG Live New York:**
**PO Box 9003**
**Lawrence, KS 66044**
**or AEG_Live_AP_NY@scanningamerica.com**

**P 803-699-8181**
**F 803-699-8059**

X_____

LMLP000001

"Non-discrimination:  In the performance of all LM Communications advertising agreements, LM Communications requires that each party not discriminate on the basis of race or ethnicity."

Want a signature like mine? Click here.

On Mon, Dec 1, 2014 at 12:08 PM, Ashley T Caldwell <ashley@themodernconnection.com> wrote:
Hey-

Okay, after some initial digging, I can say that TMC for sure did not post that event to the website. We were notified of the concert in conjunction with sending an e-blast, which we did. I attached the screenshot so you can see how it looks. We *always* use images that are provided from the promoter.

We were working on the website back in March in conjunction with Nikki and Intertech. We never had access to that login account that posted it, so there's no way it could have Jessica or any of our staff. It doesn't match our writing style or best practices either, ESPECIALLY using a stolen image.

After talking to Jessica, she remembers that Nikki was involved with event postings around that time, and that it seems as thought she might have been the one. However, I doubt that Intertech would have given her the super admin account access either -- she probably had her own login too.

My best guess: Intertech posted it, maybe as a training example for Nikki?

Let me know if you need anything else from us. Sorry you're having to deal with this. :-/

On Mon, Dec 1, 2014 at 11:08 AM, Kelly Bazzle <kelly@radioofcharleston.com> wrote:
It was a website event post, not a FB post. I have some of the screen shots from the post and from the backend of the site before I deleted it. It's no longer up on our site at all. It would have had to been searched for after May 8th because the event had passed.

The image was on the wikipedia site as well, and there's credit given to the photographer on that site. http://en.wikipedia.org/wiki/Willie_Nelson

http://commons.wikimedia.org/wiki/File:Willie_Nelson_at_Farm_Aid_2009.jpg

I don't know what other info I can give, we just need to talk to JBT about it and see if she posted and why she thought it was ok to use the picture. Thanks Ash!
Kelly

On Mon, Dec 1, 2014 at 10:52 AM, Ashley Caldwell <ashley@themodernconnection.com> wrote:
Hey guys -

Just getting to the email about this. The Willie Nelson photo was probably something Jessica took care of back in March. She is (along with all of TMC) very careful about copyright images, so I would be very surprised if she just Googled an image and took one. This is what we preach day in and day out!

3

LMLP000005

# MARTIN DEPO EXHIBIT 5

# (Confidential Portions Redacted)

### Larry G. Philpot
Concert and Publicity Photographic Services
8125 Halyard Way, First Floor
Indianapolis, Indiana 46236-9569
v. 317-567-1338 – larry@behindthemusic.net – www.soundstagephotography.com – f. 317-855-7527

*CONFIDENTIAL*
*(all pages)*

November 18, 2014

Scooter Stevens
LM Communications
401 W. Main Street, Suite 301
Lexington, KY 40507

Re:  Cease and Desist -- Unauthorized Use of Copyrighted Image(s)

Dear Sir or Madam,

# Redacted



Redacted

I also must advise you at this point that, under the Federal Rules of Civil Procedure as interpreted by courts in the Southern District of Indiana, LM Communications must take immediate steps to assure that information (both in paper and electronically-stored form) relating to the use of my image is not altered, deleted, or otherwise tampered with.  Accordingly, please construe this letter as a formal notice of your company's continuing legal obligation to preserve all such information until further advised.

Redacted

Cordially,

/s/ Larry Philpot
Larry Philpot
Encl.

EXHIBIT A



EXHIBIT  B

Willie Nelson with Alison Krauss | Charleston, SC 105.5 The Bridge

*Headed Stranger* (1975) and *Stardust* (1978), made Nelson one of the most recognized artists in country music. He was one of the main figures of outlaw country , a subgenre of country music that developed in the late 1960s as a reaction to the conservative restrictions of the Nashville sound. Nelson has acted in over 30 films, and co-authored 30 books.



**Details**

Date:
May 9, 2014

Time:
6:00 pm - 10:00 pm

Event Tags:
Charleston Concerts

Website:
http://willienelson.com/event/family-circle-cup-stadium/

**Venue**

Family Circle Stadium

161 Seven Farms Dr, 29492, Charleston, SC 29429 United States
← Google Map

